IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v ) | CR. NO. 2:10-cr-125-WHA |
| ) | |
| RODNEY EDWARD THOMPSON ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**

On August 4, 2010, defendant Rodney Edward Thompson ("Thompson") filed a motion to suppress all items seized and statements obtained as a result of a police stop and search of his car on September 19, 2009, in Montgomery, Alabama, in the Middle District of Alabama. (Doc. # 16 at 1). Claiming that the stop, seizure and subsequent search of his vehicle were unsupported by reasonable suspicion or probable cause, Thompson contends that all evidence seized and statements made should be suppressed as violative of the Fourth Amendment

The court held an evidentiary hearing on the defendant's motion to suppress on September 22, 2010, and allowed the parties to file supplemental post-hearing briefs. Based on the evidence presented during the hearing, the court concludes that the motion to suppress is due to be denied.

**II. FACTS**

Shortly after 1:30 a.m on September 19, 2009, Montgomery Police Officer B. W. Capps and trainee officer C. D. Thomas were on patrol in a marked police car when they

received a call from dispatch that shots had been fired in the area of Wade Street and Bellview Street in Montgomery, Alabama. (Evid. Hr'g Tr. at 4) Dispatch informed Capps that the "ShotSpotter" system picked up what appeared to be gunshots in that area. (*Id*. at 5) According to the ShotSpotter system, five shots were fired while moving five miles per hour.[1] Capps and Thomas arrived on the scene and saw a blue sports utility vehicle driving away from the intersection of Wade and Bellview Streets. (*Id*. at 6) As they pulled into the area, Capps testified that four or five people were on the street, pointing in the same direction and saying "that the vehicle leaving the area is the one that was doing the shooting." (*Id*.) There were no other vehicles in the area. (*Id*. at 7 & 17)

Capps initiated a traffic stop by activating his blue lights to pull the vehicle over. (*Id.* at 7 & 20) The driver of the vehicle did not stop immediately but did stop a short while later. (*Id*.) Once the vehicle stopped, Capps approached the driver side of the car and Thomas approached the passenger side of the car. (*Id*. at 8) Capps shouted to the driver "let me see your hands." (*Id*.) The driver then opened the car door and began to step out of the vehicle. (*Id*.) With his gun drawn Capps approached the driver cautiously until he could see the driver's hands. (*Id*. at 9) When he was able to see the driver's hands, Capps also was able to see a gun "between the driver's seat and the center console." (*Id*.) Capps had to physically secure Thompson, including using a choke hold noting that he was "not willing to fight with a subject that close to an open door of a vehicle that's running and a

---

[1] Capps testified that the ShotSpotter system works "sort of like a sonar," picking up sounds like gunshot and pinpointing them. (Evid. Hr'g Tr. at 5).

gun in the car." (*Id.* at 10)

Capps identified the driver as defendant Rodney Thompson. (*Id.* at 30) After handcuffing Thompson and placing him in the back of the patrol car, Capps retrieved the gun. (*Id.* at 23-24 & 10) It was "sitting handle up and stuck between the driver's side and the center console." (*Id.* at 63) The handle was visible to Capps from the driver's side of the vehicle. (*Id.*) The gun was warm to the touch and smelled of gun powder. (*Id.* at 10) There were also six spent shells in the gun. (*Id.* at 11)

### III. DISCUSSION

Thompson challenges both the initial traffic stop and subsequent search of his vehicle as lacking reasonable suspicion or probable cause.[2] The Fourth Amendment protects individuals from "unreasonable searches and seizures" by government officials, and its protections extend to "brief investigatory stops of persons or vehicles." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Absent probable cause, law enforcement officials may briefly detain a person as part of an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in criminal activity. The Fourth Amendment is satisfied "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). *See also*

---

[2] In his motion to suppress, Thompson argues that the traffic stop was unreasonable because it was based on an unconfirmed anonymous tip. (Mot. to Suppress, doc. # 16, at 3-4). At the hearing on the motion, the defendant acknowledged that the facts did not support that argument. (Evid. Hr'g Tr. at 66-67).

3

*United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) ("Because a routine traffic stop is only a limited form or seizure, it is more analogous to an investigative detention than a custodial arrest. . . . Therefore, we analyze the legality of these stops under the standard articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).") (citations in original omitted).

When determining whether reasonable suspicion exists, courts must consider the totality of the circumstances to determine whether the police officer had a "particularized and objective basis" for suspected legal wrongdoing. *Arvizu*, 534 U.S. at 273 (citation omitted). In so doing, "the reviewing court must give due weight to the police officer's experience." *United States v. Briggman*, 931 F.2d 705, 709 (11th Cir. 1991). The reasonable suspicion required for a *Terry* stop is more than a hunch, and considering the totality of the circumstances, must be supported by some minimal level of objective justification that the person engaged in unlawful conduct. *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989)*; United States v. Diaz-Lizaraza,* 981 F.2d 1216, 1221 (11th Cir. 1993).

Capps testified that he initiated the traffic stop after receiving information from dispatch and receiving information at the scene from witnesses on the scene. Dispatch informed Capps that the ShotSpotter system identified possible gun shots from the area of Wade and Bellview Streets traveling at approximately five miles per hour. (Evid. Hr'g Tr. at 5). When Capps arrived, several witnesses on the scene identified Thompson's vehicle as the one from which shots were fired. (*Id.* at 6, 8, 16, 17, 46 & 56). When Capps and

4

Thomas activated the blue lights to pull the vehicle over, it did not stop immediately but first circled the block, running several stop signs in the process. (*Id.* at 47). This information was sufficient to give rise to a reasonable suspicion that a person in the vehicle may have engaged in criminal activity by firing a pistol.[3]

On September 13, 2010, the Eleventh Circuit held, on very similar facts, that a traffic stop was justified by the officer's reasonable suspicion. In *United States v. Williams*, 619 F.3d 1269 (11th Cir. 2010), the defendant was stopped by police investigating nearby gunfire. In *Williams*, the officer heard a gun shot and witnessed a car quickly leave a housing project. The officer stopped the car and saw the passenger attempt to hide the gun. Both the district court and the Eleventh Circuit upheld the traffic stop as justified by reasonable suspicion.

> The only question here is whether Officer Hunt had reason to suspect that the occupants of the car he stopped had been involved in criminal activity. "[T]he concept of reasonable suspicion is somewhat abstract," but this much is clear: we must consider the "totality of the circumstances" and

---

[3] The court notes that, although Capps did not stop Thompson for a traffic violation, Capps could have stopped Thompson for failing obey the stop signs. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren,* 517 U.S. at 810. *See also*, *United States v. Pruitt,* 174 F.3d 1215, 1217 n. 1 (11th Cir. 1999) ("We agree that, because Pena was speeding, and a traffic violation had thus occurred, probable cause existed for the stop. Accordingly, the stop was reasonable for purposes of the Fourth Amendment, and withstands review."). A police officer "may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic . . . regulations relating to the operation of motor vehicles." *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) (quoting *United States v. Strickland*, 902 F.2d 937, 940 (11th Cir. 1990)). When Thompson failed to stop at the stop signs, Capps had probable cause to believe that Thompson had committed a traffic violation. Accordingly, the court concludes that a reasonable officer in Capp's position could have stopped the defendant's vehicle for failing to stop, and, therefore, Capps had probable cause to stop Thompson. However, Capps did not testify that he stopped Thompson because of the violations. Thus, there is no need for further discussion of this point.

> determine for ourselves whether Officer Hunt had a "particularized and objective basis for suspecting wrongdoing." *Arvizu*, 534 U.S. at 274, 273 (quotation marks omitted). "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id*. at 274 (quotation marks and citations omitted)
>
> Williams argues that Officer Hunt lacked justification to conduct a *Terry* stop because the housing project had two exits, Officer Hunt could see only one of them, and the shooter could have used (sic) other.  But the law does not require absolute certainty or even probable cause before an officer stops a car; he need only reasonably suspect that its occupants are involved in criminal activity.  When Officer Hunt saw a lone vehicle hurriedly pulling out of a high-crime housing project in the middle of the night within seconds of a gunshot, it was eminently reasonable of him to suspect that the car's occupants might have committed a crime.  *Accord United States v. Bolden*, 508 F.3d 204, 206 (5th Cir. 2007) )"[W]hen an officer sees a solitary vehicle . . . leaving the precise spot where that officer has good reason to believe that multiple persons were shooting less than a minute before, it is more than a 'hunch' that those in the vehicle may be involved in the shooting."); *United States v. Henning*, 906 F.2d 1392, 1396 (10th Cir. 1990) (concluding that reasonable suspicion justified the stop of a lone car, moving quickly, that "emerged from the general area of an early morning gunshot heard by officers only seconds earlier" in a high-crime area.)

*Williams*, 619 F.3d at 1271 (alternations in original; footnotes omitted).

In this case, the fact that Officer Capps did not hear gun shots himself is immaterial. He relied on the information from dispatch that the ShotSpotter system alerted to possible gun shots in the area.  Moreover, when Officer Capps arrived on the scene, multiple witnesses pointed to the defendant's vehicle and told Capps that the man firing the weapon

6

was in the vehicle. This information was sufficient to justify stopping Thompson's vehicle. Thereafter, reasonable suspicion developed into probable cause when Capps saw the gun in plain view between the driver's seat and the console. When Capps saw the gun, he then had probable cause to arrest Thompson for discharging a weapon. Consequently, the court finds that the defendant's rights secured by the Fourth Amendment were not violated because reasonable suspicion existed for the stop.

Thompson also argues that the government failed to meet its burden of proof to justify the subsequent search of Thompson's car. Thompson's argument is premised on differences in Officer Capps and Trainee Thomas' testimony concerning Capps' altercation with Thompson. Thompson essentially argues that the court should credit Thomas' rather than Capps' testimony because Thomas's testimony is more detailed and less vague than Capps' testimony.

The hearing on the suppression motion took place approximately one year after the arrest of Thompson. Thus, discrepancies in the memories of the participants about details of the arrest are certainly not unexpected or extraordinary. Officer Capps testified he saw the gun in the car. Thomas testified that he was not in a position to see the gun. (Evid. Hr'g Tr. at 51-53). After careful consideration of the evidence as a whole, the court concludes that the discrepancies between the two officers does not compromise the integrity of Capps' testimony about the gun.

Relying on *Arizona v. Gant*, 556 U.S. ----, 129 S.Ct. 1710 (2009), Thompson argues

7

that even with probable cause, the officers still could not search Thompson's car. In *Gant*, the Supreme Court overruled *New York v. Belton*, 453 U.S. 454 (1981), and held that a search incident to an arrest following a traffic stop is permissible only where the arrestee can reach the passenger compartment at the time of the search, or where the officer has a reasonable belief that the vehicle contains evidence of the crime of arrest. --- U.S. ----, 129 S.Ct. 1710, 1723 (2009). Neither the law nor the facts support Thompson's *Gant* argument.

> Q. So what did you do, Officer Capps?
>
> A. At that time, I advanced closer to him due to the fact there were people in the area. I still had my gun drawn. I had not seen a gun as I'm approaching the driver, but I also can't see both his hands, because he's still somewhat inside the vehicle. I want to get close enough to him so if I do have to shoot him, I'm not going to miss. There are people in the area that have seen the shooting. There are still people watching us do what we're doing. I wanted to make sure that if I was going to have to shoot him, that he was going to be the only person who was shot.
>
> Q. What happened next?
>
> A. As I got closer to him, I was able to see both of his hands. I got approximately two feet from him, was able to see both of his hands. At the same time I saw his hands, I could see the pistol sitting between the driver's seat and the center console. As soon as I saw the pistol, I immediately holstered my weapon and grabbed the subject from -- grabbed the subject, removed him from the door of the vehicle, and began to place him on the vehicle, still not -- he's not fighting, but he's not complying. I'm having to

8

>    do everything for him. I'm having to put him on the vehicle and having to turn him around.
>        At this time, my partner has realized that I guess he's the only one in the vehicle and that I now have him. I'm going hands-on with the subject. Comes around. I have to administer a choke hold because he's -- his hands are not doing what I want them to do. And I'm not willing to fight with a subject that close to an open door of a vehicle that's running and a gun in the car.
>
> Q.    Now, Officer Capps, you've mentioned that when you approached the subject, that you saw the gun in the vehicle.
>
> A.    Yes, sir.
>
> Q.    Is that right?
>
> A.    Yes, sir.
>
> Q.    Did you have to move anything at all to see that gun?
>
> A.    No.
>
> Q.    Was it in plain view to you?
>
> A:    Yes.

(Evid. Hr'g Tr. at 9-10).

Here, the location and seizure of the gun was certainly relevant to the crime for which Thompson was stopped. Secondly, *Gant* does not compel officers to ignore evidence of a crime which they observe in plain view from a vantage point where they have a right to be. *See, e.g., United States v. Rumley*, 588 F.3d 202, 205-06 (4th Cir. 2009)

9

(upholding search of a vehicle and seizure of a pistol in the face of a *Gant* challenge because of the "plain-view" exception to the warrant requirement), *cert. denied* --- U.S. ----, 130 S.Ct. 2123 (2010) .

## CONCLUSION

For the reasons as stated, the court finds that the defendant's rights secured by the Fourth Amendment were not violated. Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the defendant's motion to suppress be denied. It is further

ORDERED that the parties shall file any objections to the said Recommendation **on or before February 28, 2011.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent

all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 14th day of February, 2011.

          /s/Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE